CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
December 16, 2025
LAURA A. AUSTIN, CLERK
BY: s/A. Beeson
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **VELLE B. PARKS,** ) | |
| Plaintiff, ) | Civil Action No. 7:23-cv-00585 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| **JARRETT SLONE,** ) | By: C. Kailani Memmer |
| Defendant. ) | United States Magistrate Judge |

Velle B. Parks, a Virginia inmate proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983. Compl., ECF No. 1. The sole remaining claim is that defendant Jarrett Slone used excessive force against Parks on September 17, 2022, at Red Onion State Prison (ROSP). The parties have consented to the undersigned magistrate judge exercising jurisdiction over this matter. *See* ECF No. 52.

Before the court is Slone's motion for summary judgment. ECF No. 65. This motion will be granted.

I.  BACKGROUND

**A.  Plaintiff's Allegations and Procedural History**

The allegations in Parks' complaint describe events occurring when he was housed at ROSP. Parks alleges that on September 17, 2022, in the wake of a fight that was being broken-up by correctional officers, Jarrett Slone shot Parks in the face with a 40-millimeter shotgun round. *See* Compl. at 3. Plaintiff had a gash on his forehead, his left eye was completely swollen shut, and he was treated for a possible concussion.

In addition to his claims against Slone, Parks brought claims against C. Meade and T. Trapp, who moved to dismiss, and Nurse Leah Holbrook, who moved for summary judgment. These motions were granted by the court on September 9, 2024. ECF No. 49, 50. Thus, the only claim that remains is the excessive force claim against Slone.

B.  **Facts in Support of Slone's Motion for Summary Judgment**

In support of his motion for summary judgment, Slone filed an affidavit along with an Internal Incident Report dated September 17, 2022. ECF No. 66-1. Slone also provided an affidavit by E. Shirks, an intelligence officer at ROSP. ECF No. 66-2. Attached to Shirks' affidavit are three surveillance videos of pod A-5 at ROSP, photographs of barber clippers, and a photograph of the 40mm Direct Impact tool. *See id.*; ECF No. 70, Order Granting Motion to Seal Surveillance Videos; ECF No. 71. The three videos are identical, showing the same time and place, except they are taken from different angles. Shirks Aff. ¶ 5.

On September 17, 2022, Officer Slone was assigned to the A-2 Control gunman post. Slone Aff. ¶ 4. Parks was in the recreation area of the A-5 pod at approximately 2:01 p.m. Shirks Aff. ¶ 6. The video shows Parks standing at a kiosk on the far wall in the videos where a black and white "Notice" sign is visible. Videos at 14:01:00. Parks is wearing a burgundy shirt and pants and a black barber apron. He is on the far-left side out of five total inmates at the kiosk. Shirks Aff. ¶ 6. Parks approached another inmate named Stinnie who is at the phone wearing a white shirt and gray shorts, sitting against the wall at the kiosk. The videos show Parks striking Stinnie with the barber clippers. *Id.*; Videos at 14:01:25. The attack appears to be unprovoked. Parks then turns and swings the clippers at inmate K. Smalls, who is also at or on the phone at the kiosk. Shirks Aff. ¶ 7. Smalls is wearing a white shirt and burgundy pants. Videos at 14:01:26.

Slone observed the altercation involving Smalls, Parks, and Stinnie. Slone Aff. ¶ 5. He sounded the audible alarm located in A-2 control while giving verbal warnings for the inmates to stop fighting and lay down. *Id.* ¶ 6. The inmates did not comply and continued fighting. Parks is seen holding and swinging barber clippers towards the other inmates. Videos 14:01:30–14:02:00.

Next, Officer Mullins and Officer Fox enter the A-5 pod, while Parks chases inmates Stinnie and Smalls around the pod while swinging the clippers, continuing to fight. Shirks Aff. ¶ 8. The

other inmates not involved in the altercation moved to stand by a cell door or laid down on the pod floor. Shirks Aff. ¶ 9; Videos at 14:01:28.

Because the three inmates continued to fight, Officer Mullins utilized OC spray on the inmates. Shirks Aff. ¶ 10; Videos at 14:01:28. Officer Slone, who can be seen standing at the window in an elevated booth, deployed a Direct Impact OC round from a 40MM launcher aiming at the lower extremities of the inmates to get the inmates to stop fighting. Shirks Aff. ¶ 10; Videos at 14:01:29; Slone Aff. ¶ 7. The single round was not effective and did not deter the inmates from fighting. Slone Aff. ¶ 7.

The Direct Impact tool is a type of Specialty Impact Munitions (SIM) which help control aggressive subjects or deter unwanted behavior. Shirks Aff. ¶ 13 (citing John A. Kepeles, TECHNICAL REPORT: THE DIRECT IMPACT (2020) at p.1.) SIMs are helpful in crowd management scenarios and in targeting specific aggressive persons. SIMs allow the user to elicit compliance from the subject without physical contact. SIMs can cause injury, but the design, materials, and performance of the munition and impact projectile minimizes the likelihood of serious injury. *See id.*

The Direct Impact tool includes a specially engineered projectile combined with a smokeless propulsion system. Shirks Aff. ¶ 14. The key feature is a "rigid, crushable foam nose that incorporates an aerodynamic external contour and a hollow internal cavity to carry a 5-gram payload." *Id.* The payload options are an inert powder, an OC irritant power, or a fluorescent green marking compound. The rigid foam nose is designed to deform and crush when it hits a target. Deformation and crushing increases the surface area of impact and causes the payload to eject, dispersing a two-foot diameter cloud of irritant or marking compound. This action dissipates significant energy, decreasing the kinetic energy transferred to the target and reducing the possibility of injury. *See id.*, Encl. C.

When Officer Slone's initial OC round was determined to be ineffective, Slone gave additional warnings to the inmates, which were ignored. Slone Aff. ¶ 8. Slone then deployed three separate direct impact inert rounds with a pause between each round, aiming at the lower extremities. Shirks Aff. ¶ 10; Videos at 14:01:42; Slone Aff. ¶ 8.

Officer Collins entered the A-5 pod and administered one burst of OC spray. Shirks Aff. ¶ 11; Slone Aff. ¶ 9. When the chemical agent had time to take effect, Smalls and Stinnie were subdued and lay face down to be restrained. Shirks Aff. ¶ 11; Slone Aff. ¶ 9; Videos at 14:01:54. Officer Fuller had also entered the pod to respond, and Parks ran swiftly towards her as she entered the area. Shirks Aff. ¶ 12; Slone Aff. ¶ 10; Videos at 14:01:56. Officer Slone perceived that Parks was approaching Fuller in an aggressive manner while refusing orders to lay down on the pod floor. Slone Aff. ¶ 10. Collins attempted unsuccessfully to utilize OC spray on Parks. Videos at 14:01:59. Parks is seen moving rapidly towards the open door of the pod. Videos at 14:01:58–14:02:02.

Officer Slone deployed one Direct Impact round using the 40mm launcher, aiming at plaintiff's lower extremities, but he struck Parks in the head. Slone Aff. ¶ 10; Videos at 14:02:00. Slone states that he did not intentionally aim at Parks' head; Parks was not laying on the floor when Slone deployed the round. Slone Aff. ¶ 13. After deployment of the Direct Impact round, Parks dropped to the floor and laid face down. Shirks Aff. ¶ 15. Inmates Stinnie and Smalls were restrained and removed from the pod. Shirks Aff. ¶ 16; Videos at 14:02:45. Parks is then restrained and removed from the pod. Shirks Aff. ¶ 17; Slone Aff. ¶ 11; Videos at 14:03:18. Parks was escorted to the medical department to be evaluated by staff. Slone Aff. ¶ 11.

C.  Parks' Response to Motion for Summary Judgment

In his response to the motion for summary judgment, Parks submitted an affidavit and 11 pages of exhibits, which includes a declaration by fellow inmate Rashad Hillman. ECF Nos. 77-2, 77-3.

Parks states that the incident on September 17, 2022, was an "inmate on inmate altercation." Parks Aff. ¶ 2. He avers that while other correctional officers were containing the situation and "keeping the inmates from further engaging in physical combat," Officer Slone was "still firing the launcher in a reckless, willful manner in disregard of the law, rights, or the safety of inmates or other officers." *Id.* ¶¶ 3–4. According to Parks, the inmates had stopped fighting once the mace took effect. However, Officer Slone was "still discharging the firearm in a manner not consistent with his training and the manufacture[r] design and recommendations . . ." Also, Officer Slone shot another inmate, Rashad Hillman, who was not involved in the incident, and was laying on the ground in compliance with the officers' orders. *Id.* ¶ 5.

Contrary to Officer Slone's affidavit, Parks avers that he did not approach any security staff in a threatening manner. The video at 14:01:58 shows Officer Fuller sprinting into A-5 utilizing her mace. The video shows a staircase with Parks on one side and her on the other side. She was running in one direction and Parks in the opposite direction. Parks had his hands by his side and "never approached her in an aggressive manner." *Id.* ¶ 6. Parks also states that the video (14:02:01) shows Officer Slone shooting Officer Fuller in the neck "due to his recklessness handling of the firearm." *Id.* 7.

Parks next remembers getting shot in the head. Parks asserts that the video at 14:02:05 shows Officer Slone shooting Parks in the head and knocking him unconscious. Parks states that Slone's actions were "motivated by the malicious intention to forcefully get me to comply with orders to lay down on the ground." *Id.* ¶ 8. Parks again states that the video shows him going in the opposite direction of Officer Fuller, not approaching her in an aggressive manner. Accordingly, the force was unnecessary. *See id.*

5

After the round was deployed, Parks was unresponsive laying on the floor. Officer Fuller then restrained Parks and handcuffed him. Parks was also escorted to medical for treatment, where he was housed for three weeks due to the severity of his injuries. *Id.* ¶ 10.

Mr. Hillman declares that he was incarcerated in the same unit as Parks. He describes the September 17 fight among three inmates, and "without warning" Officer Slone "started shooting a shotgun wildly and in total disregard of anyones [sic] safety." Hillman noticed Slone shooting Parks in the head as Hillman was laying on the ground. "Due to the officers [sic] recklessness I was on a different side of the unit away from the fight and I was also shot. I was taken to medical and treated." ECF No. 77-3.

## II.  ANALYSIS

### A.  Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a summary judgment motion, a court "must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in the pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate the existence of specific, material facts that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Likewise, conclusory

allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248.

**B. Eighth Amendment Excessive Force.**

An inmate's Eighth Amendment excessive force claim involves both an objective and a subjective component. *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021). The objective component looks at whether the force applied "was sufficiently serious to establish a cause of action." *Id.* Force is sufficiently serious if it is "something more than 'de minimis' force." *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019) (quoting *Hudson v. McMillian*, 503 U.S. 1, 10 (1992)).[1]

The subjective component asks whether an officer "acted with a sufficiently culpable state of mind." *Brooks*, 924 F.3d at 112. Under this standard, the state of mind required is "wantonness in the infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (citing *Whitley v. Albers*, 475 U.S. 312, 322 (1986)). Whether an inmate can establish wantonness "turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Jones*, 984 F.3d at 302 (quoting *Whitley*, 475 U.S. at 320–21). The relevant factors to consider when asking if an officer applied force in "good faith" or with an intent to cause harm are: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response. *Iko*, 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 321). Correctional officers apply force with intent to harm "when they inflict pain not to protect safety or prison discipline but to punish or retaliate against an inmate for his prior conduct." *Jones*, 984 F.3d at 302. "The use of force on an inmate who is 'restrained and compliant and posing no physical threat' raises the

---

[1] While Officer Slone advances an argument that Parks cannot satisfy the objective component, the court finds it unnecessary to address the objective part of the inquiry.

specter of such an impermissible motive." *Id.* (quoting *Thompson v. Virginia*, 878 F.3d 89, 201 (4th Cir. 2017)).

Under the subjective prong, application of the four factors demonstrates that Officer Slone acted in good faith to stop the inmate altercation on September 17, 2022. First, use of the Direct Impact tool was necessary to force Parks to stop his threatening behavior. The necessity of use is supported by Parks' aggressive actions and the inability to subdue Parks by other means, including direct commands to stop and OC spray. Parks argues that he was not moving towards Officer Fuller, but review of the video shows that it was reasonable for Slone to conclude that Parks was acting in an aggressive and threatening manner and could have harmed Officer Fuller or escaped into another room. *See, e.g.*, *Freeman v. Deas*, No. 5:18-CT-03113-M, 2020 WL 5491690, at *3 (E.D.N.C. Aug. 26, 2020) (granting summary judgment for prison officer and finding that because "the record supports a finding that Deas' use of force was a necessary response to plaintiff's non-compliance with verbal commands and plaintiff's aggressive actions towards Deas, the first *Whitley* factor favors Deas"); *West v. Byers*, C/A No. 5:13-cv-3088 DCN, 2015 WL 5603316, at *7 (D.S.C. Sept. 23, 2015) (finding "sufficient need for application of force" under the first prong of *Whitley*, "based on Plaintiffs aggression towards Defendant Williams and his refusal to obey a direct order").

Second, in considering the need for force in relation to the amount of force used, Slone's use of one round from a distance towards Parks illustrates that he did not act maliciously and sadistically with the intent to cause harm. While the round struck Parks in the face, Slone was aiming for his lower extremities. *See* Slone Aff. ¶ 13 ("I had to deploy one direct impact round, and aimed at inmate Parks' lower extremities, to gain control of the situation. I did not aim intentionally at Parks' head and inmate Parks was not laying down on the pod floor when I utilized the direct impact round."). In a similar case, the court granted summary judgment and found in favor of prison officers on the second *Whitley* factor where an officer "fired one round from the 40mm single

8

launcher, gave another warning, and then fired six direct impact rounds towards the lower extremities of the inmates who were fighting, pausing between each round." *White v. Clarke*, Civil Action No. 7:22-cv-00082, 2023 WL 1867468, at *4 (W.D. Va. Feb. 9, 2023); *see also Alana v. Rose*, CASE NO. 7:18CV00420, 2020 WL 3050236, at *6 (W.D. Va. June 8, 2020) (granting summary judgment to officer where "video alone does not disprove Alana's assertion that Rose purposely aimed at least two of the impact rounds at the inmates' heads," but "Rose's affidavit . . . based on his personal knowledge of his own actions, states that he aimed all shots at the inmates' lower extremities").

Third, Officer Slone reasonably perceived a threat from Parks, who attacked two inmates and was unrestrained in the pod, swinging his barber clippers, and refusing to respond to commands from correctional officers. Parks also ran aggressively towards Officer Fuller and towards an open door. Fourth and finally, Officer Slone made efforts to minimize the possibility of injury by giving verbal commands, using the Direct Impact tool (which is designed to be low impact), and aiming at Parks' lower extremities. Officer Slone also did not continue using the tool once Parks had been subdued. With respect to the OC spray component of the Direct Impact tool, the use of OC spray is not "*per se* cruel and unusual punishment," and its use is permissible to "control recalcitrant inmates." *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996); *see also Jackson v. Morgan*, 19 F. App'x 97, 102 (4th Cir. 2001) (upholding use of pepper spray 12 times when prisoner refused to comply with orders to move from his cell); *Singletary v. Iames*, Civil Action No. PWG-16-3712, 2018 WL 1083731, at *6 (D. Md. Feb. 28, 2018) (granting summary judgment on excessive force claim where defendant "sprayed pepper spray to make Plaintiff comply with his order and secure Plaintiff's cell").

9

In sum, Officer Slone is entitled to summary judgment because the evidence demonstrates that he acted in a "good faith effort to maintain or restore discipline," not "maliciously and sadistically for the very purpose of causing harm" to Parks. *See Jones*, 984 F.3d at 302.

### III.  CONCLUSION

The court will issue an appropriate order granting summary judgment in favor of Officer Slone and dismissing this matter in its entirety.

ENTER: December 16, 2025.

*/s/ C. Kailani Memmer*
United States Magistrate Judge